Filed 8/12/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| MARY D.,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MATTHEW McCAULEY,<br><br>    Defendant and Appellant. | A170749<br><br>(Alameda County Super. Ct. No. RG21106563 ) |

Mary D.[1] sued Matthew McCauley for personal injury based on years of sexual abuse when she was a minor.  A jury found him liable for multiple torts, and it awarded Mary D. compensatory and punitive damages.

On appeal, McCauley contends that the trial court:  (1) deprived him of his constitutional right to meaningful access to the courts—and abused its discretion—by denying his requests for a continuance to enable him to retain counsel; (2) deprived him of his constitutional right to a fair trial by allowing the trial to proceed when the court reporter attended remotely one day and when videoconferencing audio was intermittently choppy; and (3) abused its discretion by admitting into evidence school photographs of Mary D. during the years of abuse.  McCauley also contends that insufficient evidence of his financial circumstances supports the jury's punitive damage award, and that the award was excessive.  He requests that we reverse the punitive damage

---

[1] "Mary D." is a pseudonym for plaintiff used in the trial court and on appeal.

award with no remand for retrial. Based on any one of the remaining errors, or based on their cumulative effect, McCauley requests that we reverse the judgment and remand the matter for a new trial on liability and compensatory damages.

We agree with McCauley that the trial court abused its discretion and violated his constitutional rights by denying his continuance requests. We therefore reverse the judgment and remand for a new trial, although we conclude that Mary D. is entitled to retry all issues, including punitive damages.

In light of this disposition, we do not reach McCauley's argument that the court reporter's remote attendance or the audio problems prevented a fair trial. We also do not reach his punitive damages contentions. But since the question likely will recur on remand, we explain why we see no error in the trial court's decision to admit the school photographs.[2]

## BACKGROUND

## I.

In 2021, a jury convicted McCauley of felony counts relating to his sexual abuse of Mary D. The criminal court sentenced him to prison, where he remained. About two months after he was convicted, Mary D. filed this civil action against him. McCauley initially retained a lawyer to represent him in the case.

During the same period, McCauley was also involved in divorce proceedings in family court. Around the time that Mary D. filed her lawsuit, the family court set up a blocked account for McCauley to prevent him from

---

[2] We grant McCauley's requests for judicial notice of documents filed in his divorce action and of this court's online docket in his criminal case, as well as the court's online listing of the parties and their attorneys.

fraudulently transferring assets. A few months later, around September 2021, the family court directed a deposit into the account of $536,265.

About a year later, around July 2022, McCauley ran out of unblocked funds. In August, he filed a substitution of counsel and began to represent himself. At this time, trial was set for April 3, 2023. In January 2023, at Mary D.'s request, the court continued the trial date to October 2, 2023.

On July 13, 2023, the court filed an undated letter from McCauley in which he requested that the court grant him access to his blocked funds so that he could retain counsel. He noted that he was incarcerated and contended that he was unable to meaningfully participate in the case on his own.

The next day, McCauley appeared remotely at a previously scheduled case management conference.[3] He told the court (Hon. Tara Desautels) that he was in the process of securing representation and should be able to do so within two weeks. Judge Desautels told McCauley that she had no authority to order access to his funds, and she advised him to make a request "forthwith" of the family court judge handling his divorce case.

The minutes from the next case management conference, held a month later on August 18, recounted that "defendant [had] represented he anticipated securing counsel for the instant action within two weeks . . . however no notice of substitution appears to have been filed." The court instructed that McCauley "must file a substitution of attorney before the next

---

[3] The record contains only the minutes from pretrial proceedings. There are no reporter's transcripts or agreed or settled statements.

3

hearing" and "is to also obtain an order in his family case . . . regarding access to his funds."

By the next case management conference, three weeks later on September 8, McCauley had not filed a substitution of attorney. He represented that he had been unable to obtain an order from the family court to access his funds. The court found good cause to continue the trial to November 13. It scheduled the next case management conference for October 11.

There is no evidence in the record about when McCauley mailed his request for access to his funds to the family court, although he dated the request August 30 and the supporting declaration August 31, and McCauley's wife filed responsive documents on September 27. The register of actions shows that the court filed the request on October 2, and three days later, it issued an order setting a hearing on the matter for October 25.

Meanwhile, the trial court held its scheduled case management conference on October 11. The court instructed McCauley to update the court "forthwith" about a ruling from the family court regarding his request.

McCauley did not appear at the October 25 family court hearing, and that court continued it to November 8. In his opening brief on appeal, McCauley notes that there is no indication that the order setting the October 25 hearing date had been served on him. The next day, the clerk mailed the minutes from the October 25 hearing, which included the videoconference information for the next hearing, to McCauley in prison.

At the October 27 pretrial conference in this action, McCauley reported to the trial court that he had no update regarding the requested family court order. The trial court's minutes note that the family court had continued the October 25 hearing to November 8 because McCauley had been unable to

4

appear. The trial court continued the pretrial conference again, this time by about two weeks, to November 13, five days after the family court hearing date. It continued the trial by three weeks to December 4.

McCauley attended the family court hearing on November 8, but the court did not rule on his request. It continued the hearing to December 5. We presume that McCauley had notice of the December 5 family court hearing because he was present at the hearing at which it was set, although it does not appear from the record that the court served McCauley with its minutes or any other document that would have enabled him to appear remotely, as it had for the November 8 hearing.

On November 13, the trial court in the civil action issued pretrial conference minutes, although the minutes do not note any appearances and the register of actions shows that the court issued a tentative ruling several days earlier. The minutes note that, "[a]ccording to the register of actions, on 11/8/23, a hearing was held in [the family court]. The matter was continued to 12/5/23." The trial court continued the pretrial conference and the trial dates a third time because "the results of the [family court hearing] impact defendant's ability to retain counsel in this action . . . ." The court continued the matters by about eight weeks, but a few days later continued them by another month to accommodate a pre-planned trip by Mary D.'s counsel. As a result, the pretrial conference was set for February 16, 2024, and the trial for February 26.

McCauley did not attend the December 5 family court hearing. In his absence, the family court orally granted his request, providing him access to $100,000. There is no evidence that the minute order entered after the hearing was served on him. In the minute order, the court instructed his wife's counsel to prepare the findings and order after hearing. Although the

5

record is not entirely clear, it appears that counsel did not submit the papers until about a month later.

The family court—this time a different judge in a different department—held another hearing in January 2024 at which McCauley did not appear. There is no evidence that McCauley had notice of the hearing. His wife's counsel advised the court that McCauley was incarcerated, in light of which the court noted it could not find that McCauley had intentionally failed to appear. It directed the clerk to serve notice on McCauley in prison.

McCauley also did not appear at the next two trial court conferences in this action, which occurred in February after the case had been reassigned to a different judge (Hon. Somnath Raj Chatterjee). On February 1, the trial court had issued a general pretrial order, to which it appears Mary D. responded with a trial brief, statement of the case, witness list, and special verdict form. The record suggests that McCauley may not have received the order, since a February 21 entry on the register of actions notes that a mailed pretrial order was returned to the court.

At the first of the February conferences, held February 16, the trial court instructed Mary D.'s counsel to report back on the steps necessary to ensure that the trial court protected McCauley's due process rights during pretrial proceedings and at trial. Specifically, the court asked Mary D.'s counsel to look at whose obligation it was to request appearance assistance from the prison.

In between the two February conferences, Mary D.'s counsel submitted a responsive brief. It discussed the prison's protocol for prisoner court appearances via videoconferencing, explaining that McCauley had access to the prison's videoconferencing equipment and that it would be made available to him if there were a court order. It also discussed measures to

6

protect an indigent, incarcerated civil litigant's right to meaningful access to the courts required under the California Supreme Court decisions *Payne v. Superior Court* (1976) 17 Cal.3d 908, 922–923 (*Payne*), and *Yarbrough v. Superior Court* (1985) 39 Cal.3d 197, (*Yarbrough*). The brief noted that this right to affirmative assistance from the trial court applies only to prisoners who are indigent, and it contended that there was no evidence before the trial court that McCauley was indigent. It argued that the only appropriate "remedy" to which he was entitled was appearance at trial by videoconference or transfer to an Alameda County jail to permit him to attend in person.

At the second conference, held February 26, the trial court instructed Mary D.'s counsel to submit an order for the prison to provide McCauley with access to videoconferencing during the pretrial and trial dates. The trial court then continued the pretrial conference and trial a fourth time to April 5 and April 15, respectively, and directed the clerk to serve McCauley with a copy of the order setting these dates.

McCauley attended the April 5 pretrial conference—apparently his first appearance before the new judge—at which the parties and the court discussed witnesses and voir dire. The minutes note that McCauley informed the court that he did "not intend to present any witnesses to testify." The court continued the pretrial conference to April 12 and the trial to April 22.

Meanwhile, on April 3, the family court had finally signed a written order memorializing its December 5 oral ruling and minute order granting McCauley access to $100,000 for retaining a lawyer. The court caused the order to be served on McCauley by mail.

At the April 12 pretrial conference, a lawyer who had represented McCauley in his criminal case made a special appearance on his behalf, presumably because McCauley had learned that the family court had granted

7

him partial access to his funds.  The lawyer requested a continuance and represented that she would help McCauley find counsel.  In the first of the two continuance rulings at issue in this appeal, the trial court denied the request and continued the pretrial conference by one week to April 19.  At the continued pretrial conference on April 19, McCauley renewed his continuance request, which the trial court again denied—the second continuance ruling at issue.  As with previous conferences, neither the April 12 nor the April 19 conference was reported, and on appeal McCauley has not submitted an agreed or settled statement for either.

Trial began on April 22, with McCauley appearing remotely from prison by videoconferencing.  The court split the trial into two phases, liability and compensatory damages in the first and punitive damages in the second.

After the first phase closed, the jury returned a special verdict finding the following:  McCauley had acted negligently toward, sexually battered, assaulted, and falsely imprisoned Mary D., and his tortious acts were substantial factors in causing Mary D. harm.  The jury awarded Mary D. $10 million in past noneconomic damages, $6 million in future noneconomic damages, and $350,000 in future economic damages.  After the second phase closed, the jury found that McCauley had engaged in malicious or oppressive conduct, and it awarded Mary D. $5 million in punitive damages.

## DISCUSSION

### I.

McCauley contends that the trial court erred by denying his April 12 and April 19 requests to continue the trial.  Specifically, under *Payne, supra*, 17 Cal.3d 908, and its progeny, he argues that as an indigent, incarcerated civil litigant, he was entitled to have the court take affirmative remedial

8

steps to effectuate his constitutional right to meaningful court access. He further argues that the court's denials of a continuance violated that right. Mary D.'s response is fourfold. First, she contends that, without an agreed or settled statement of the unreported hearings at which the continuances were requested and denied (see California Rules of Court, rules 8.134, 8.137), McCauley has failed to supply an adequate record for appellate review. Second, she argues that the record does not support McCauley's claim of indigency because he could have sought access to his blocked funds long before July 2023, when he first raised the issue with the trial court. Third, she argues that, even if McCauley were effectively indigent, the trial court adequately protected his rights by ensuring that he could attend and participate in the trial by videoconference. Finally, she maintains that any error in denying a continuance was harmless. We take up these arguments in turn after addressing the parties' dispute about the standard of review. In a final section, we address McCauley's argument that Mary D. should not receive an opportunity to seek punitive damages in any retrial.

**A.**

Acknowledging that denials of requests for a continuance are normally reviewed for abuse of discretion, McCauley argues that we should nonetheless review the issue de novo because it implicates his constitutional rights. He cites, for example, *People v. Seijas* (2005) 36 Cal.4th 291, which held that independent review applies to the trial court's determination whether a witness may assert the privilege against self-incrimination because it affects the defendant's constitutional right of confrontation. (*Id.* at p. 304; see also *People v. Albarran* (2007) 149 Cal.App.4th 214, 224, fn. 7 [concluding that the trial court's denial of a new trial motion should be reviewed independently because it implicated the defendant's "federal

9

constitutional rights to due process and concerns the fundamental fairness of his trial"].)

McCauley does not, however, cite a decision applying the de novo standard of review to a trial court's ruling that implicates the right set forth in *Payne, supra,* 17 Cal.3d 908. As Mary D. points out, our high court and our sister courts have uniformly treated the standard of review in that context as abuse of discretion, although there is no indication that any dispute about that question was raised. (See *Payne,* at pp. 925–927; *Yarbrough, supra,* 39 Cal.3d at pp. 204, 207; *J.S. v. D.A.* (2026) 118 Cal.App.5th 891, 896; *Jameson v. Desta* (2009) 179 Cal.App.4th 672, 678– 680, 684; *Apollo v. Gyaami* (2008) 167 Cal.App.4th 1468, 1483–1487; *Wantuch v. Davis* (1995) 32 Cal.App.4th 786, 796.) Based on the language in *Payne* and *Yarbrough*, we will apply that standard as well.

The standard presumes deference to the trial court. (*Bancomer, S.A. v. Superior Court* (1996) 44 Cal.App.4th 1450, 1457.) But "[t]he scope of discretion always resides in the particular law being applied." (*People v. Jacobs* (2007) 156 Cal.App.4th 728, 737.) " 'The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown.' " (*Westside Community for Independent Living, Inc v. Obledo* (1983) 33 Cal.3d 348, 355.)

## B.

Because a trial court's judgment or order is presumed to be correct and the burden of demonstrating error rests with the appellant, "[i]n many cases involving the substantial evidence or abuse of discretion standard of review, . . . a reporter's transcript or an agreed or settled statement of the

10

proceedings will be indispensable." (*Southern California Gas Co. v. Flannery* (2016) 5 Cal.App.5th 476, 483 (*Flannery*).) Relying on this authority, Mary D. argues that we "need not reach the merits" of McCauley's claim because he did not supply an agreed or settled statement of the two unreported hearings at which his requests for a continuance were denied.

Stated generally, the absence of a transcript or an agreed or settled statement will be fatal on appeal when the record of those oral proceedings could show that the challenged order would *not* have been an abuse of discretion. *Flannery* cited *Vo v. Las Virgenes Municipal Water Dist.* (2000) 79 Cal.App.4th 440, an appeal of an attorney fee award. In *Vo*, the trial court's order made clear that, in determining what amount was reasonable, it had considered the "entire course of the litigation," including the pleadings and the evidence presented to the jury. (*Id.* at p. 447.) The appellants, however, failed to include either the pleadings or the trial transcripts in the record. (*Ibid.*) The appellate court explained: "The absence of a record concerning what actually occurred at the trial precludes a determination that the trial court abused its discretion. It is not possible to judicially and appropriately determine from the inadequate record provided by defendant that the trial court abused its discretion in its conclusion that $470,000 was a reasonable award in comparison to the scope of the litigation as a whole." (*Id.* at p. 448.) *Flannery* also cited *Ballard v. Uribe* (1986) 41 Cal.3d 564, which challenged the trial court's denial of a new trial motion. There, the record lacked not only a transcript of the motion hearing—which could have revealed the basis for the trial court's denial—but also the transcripts of the underlying trial proceedings that would be necessary to evaluate the claimed errors. (*Id.* at p. 574.) In short, in both *Vo* and *Ballard*, the reviewing court was unable to find an abuse of discretion because the missing portions of the

11

record could readily have disclosed a proper basis for the trial court's decision.

In *Flannery* itself, the court disagreed that the appeal was subject to dismissal simply because the appellant failed to include an agreed or settled statement of the unreported hearing that led to the challenged orders. (*Flannery, supra*, 5 Cal.App.5th at p. 483.) Instead, it proceeded to evaluate the multiple claims of error, concluding only in some instances that the incompleteness of the record foreclosed them. For example, the court rejected a due process claim concerning the procedure by which the motions were granted in part because "[w]ith no reporter's transcript in the record, we presume that Flannery had the opportunity to present evidence at the hearing . . . and waived any objection to the court proceeding on the parties' declarations and exhibits alone." (*Id.* at p. 485.)

Here, the absence of an agreed or settled statement means we do not know why the court denied any continuance to allow McCauley to retain counsel once he learned that the family court had granted him access to his blocked funds. It also means, as Mary D. points out, that we do not know whether the trial court "made the threshold determinations that McCauley is indigent and that this lawsuit involves a bona fide threat to his personal or property interests," whether it considered the proper factors in evaluating how to protect his constitutional right of access, or what potential remedies it considered. But while the record's silence could work to McCauley's disadvantage on those points insofar as we will presume the court considered everything it was required to, it does not make his claim unreviewable; rather, it means we must affirm unless there is no adequate justification the

12

court *could* have given for its decision.[4]  As in other cases, we conduct our review based on the contentions raised in the briefs.  (*Connell v. Superior Court* (1997) 59 Cal.App.4th 382, 394.)  Here, again, Mary D. suggests two possible justifications for the court's decision:  First, the court reasonably could have concluded that McCauley's failure to have acted sooner in the litigation to secure access to his blocked funds meant he should not receive the heightened due process protections required for *indigent* incarcerated litigants; or second, even if McCauley were effectively indigent, the court reasonably could have concluded that his rights were adequately protected by ensuring his ability to participate in the trial by videoconference.  Accordingly, we proceed to consider these alternatives.

### C.

McCauley points us to *Payne, supra,* 17 Cal.3d 908 and *Yarbrough, supra,* 39 Cal.3d 197, and their progeny in the courts of appeal.  These decisions establish that an indigent, incarcerated person who is sued in civil court has equal protection and due process rights to meaningful court access so they can defend their interests.  If a trial court finds that an incarcerated civil litigant is both (1) indigent and (2) a party to a bona fide civil action that threatens their interests, the court must intercede to ensure the litigant's

---

[4] The presumption that an official duty has been regularly performed (Evid. Code, § 664) may allow us to presume that the trial court made a finding, one way or the other, about whether McCauley was indigent.  (Cf. *J.S. v. D.A., supra,* 118 Cal.App.5th at p. 897 [reviewing court could not conclude the trial court made the required findings under *Payne* where the minute order did not show it ruled on incarcerated defendant's request for an extension before holding unreported hearing on domestic violence restraining order request in his absence].)  But because there is no indication *which* finding the court made and Mary D. argues the trial court's denial of a continuance would have been proper whatever its finding on that question, we consider both possibilities below.

meaningful access to the courts. (*Yarbrough, supra*, 39 Cal.3d at pp. 200–201; *Apollo v. Gyaami, supra*, 167 Cal.App.4th at pp. 1483–1484.)

There is no dispute that McCauley was a party to a bona fide civil action that threatened his interests. The parties disagree only about whether he was indigent for purposes of *Payne*. McCauley argues that he was indigent because he was unable to retain counsel without access to the funds in his blocked account. Mary D. does not dispute that point—i.e., she does not suggest that McCauley had any other funds to retain counsel or that the family court granted McCauley access to his account with enough time for him to hire a lawyer before trial. But she argues that he was not indigent so as to be entitled to *Payne*'s protections because he was not diligent in pursuing the matter earlier in the case. Specifically, although she does not contend that McCauley lacked diligence *after* he raised the issue with the trial court in July 2023, she notes that there were two years between the time his blocked account received $536,265 and his later letter to the court.[5]

We are not persuaded that McCauley's failure to seek access to the blocked funds before July 2023 establishes such a lack of diligence that he should be deemed to have had access to them notwithstanding that they remained inaccessible to him for more than half a year while he sought an order from the family court. First, McCauley's letter to the family court explained that he did not exhaust his other funds until July 2022, so there was not a two-year period in which he was unable to pay counsel. Second, when he did exhaust them, trial was scheduled for April 2023, some nine

---

[5] At oral argument, Mary D.'s counsel confirmed that Mary D. bases her diligence argument solely on the period preceding McCauley's July 2023 letter to the court, acknowledging that it appears he "did his best" once the court instructed him that he would need to obtain an order from the family court.

14

months away, and in January 2023 Mary D. obtained a continuance of that date to October, apparently because she wanted to wait until McCauley's criminal conviction was final so he could not continue to assert the privilege against self-incrimination. As McCauley argues, the docket shows little action in the case between August 2022 and July 2023, with multiple dates continued by the court based on the continuance Mary D. obtained in January. Third, at the time he wrote his letter, McCauley reasonably could have believed there was enough time to gain access to the account and hire a lawyer to represent him at a trial several months away. Indeed, knowing all the particulars, Judge Desautels appears to have expected that McCauley would be able to file a substitution of counsel in time for the trial to go forward as scheduled.

The delays after that date were not the inevitable result of McCauley raising it when he did. The record reveals several shortcomings in the way the family court acted on McCauley's request. The register of actions shows that he submitted with his request for order a notice to appear remotely. The court signed an order permitting him to do so but the record does not show it was served on him. When McCauley failed to appear at the hearing on October 25, the court evidently realized the problem and continued the hearing to November 8 with an instruction that the clerk serve the minutes with the videoconference information on McCauley in prison. When McCauley appeared on November 8, the court did not rule on the request and instead continued the hearing to December 5. The record does not show that the court had the clerk send the minute order to McCauley—as it had just done before the November 8 hearing—so he did not appear at the continued hearing. When the court granted his request in his absence, it again did not have the clerk serve the minutes on McCauley and merely asked his wife's

15

counsel to submit the findings and order after hearing. It appears that a month passed before opposing counsel did so, and then three more months passed before the court signed it.

In light of McCauley's status as an unrepresented, incarcerated litigant and the time-sensitive nature of his request for access to funds, the family court could have done more to ensure that McCauley was informed of and able to attend the proceedings, as well as to resolve the issue expeditiously. (See *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1368 [acknowledging that superior courts face a heavy volume of marital dissolution matters, with a substantial majority litigated by unrepresented parties, but noting that "family law litigants should not be . . . deprived of access to justice"]; *Park v. Guisti* (2025) 116 Cal.App.5th 197, 205 ["We encourage the trial court to communicate with prison personnel as necessary to ensure Park is given a meaningful ability to attend court appearances and present his case"]; cf. *In re Marriage of Knox* (2022) 83 Cal.App.5th 15, 21 fn.2 [trial court's unreasonable delay in acting on wife's request for attorney fees pendente lite denied her "meaningful access to justice as that concept is described in the final report and recommendations of the Elkins Family Law Task Force"].) While Mary D. argues that McCauley benefitted from multiple trial continuances, they were largely occasioned by the slow progress of the family court proceedings during a time when Mary D. concedes he was diligent.[6] Those continuances indicate that Judge Desautels concluded the trial should not take place while McCauley's request was pending before the family court.

---

[6] Two later continuances were granted (1) to accommodate plaintiff's counsel's travel schedule and (2) because McCauley did not appear at the February pretrial conference, apparently because he did not receive the court's pretrial order (which the register of actions shows was returned).

16

We do not suggest that Judge Chatterjee was bound to adhere to Judge Desautels's view of that issue. The question before us is the narrower one of whether it would have been reasonable to disregard McCauley's effective indigence, notwithstanding the delays occasioned by the family court's resolution of McCauley's request, because he did not start the process earlier.[7] Having carefully considered the parties' arguments about the record, we think the answer is no. The Supreme Court emphasized that the right of meaningful access to the courts is fundamental. (*Payne, supra*, 17 Cal.3d at pp. 914, 919.) There is no dispute that, as a practical matter, McCauley was indigent as long as there was a court order preventing him from using any of his funds. We accept the principle underlying Mary D.'s argument—that McCauley, by a marked lack of diligence in protecting his right of access to the courts, might forfeit any claim to the judicial solicitude described in *Payne*. But for the reasons described above, we do not think the record shows a failure to act that would rise to that level. (Cf. *Goodhue v. Tureaud* (1979) 100 Cal.App.3d 205, 211–212 [incarcerated defendant was properly served and received written notices but took "no steps appropriately calculated to protect or suggesting a desire to protect his interest prior to suffering a default judgment"].) Again, measured against the span of the case, the period between the time McCauley exhausted his funds and raised the issue with the court was relatively brief, and for much of it the progress of the litigation was stalled by the continuance Mary D. obtained. We therefore conclude it would have been an abuse of discretion for the trial court to deny a continuance on the ground that *Payne* simply did not apply to McCauley.

---

[7] Again, we do not know whether that was Judge Chatterjee's view; we are considering a potential justification for the denial of a continuance as argued by Mary D. in her brief.

17

**D.**

We turn to Mary D.'s alternative argument that the trial court adequately protected McCauley's rights by ensuring that he could participate in the trial by videoconference. We start by examining *Payne, supra*, 17 Cal.3d 908, and *Yarbrough, supra*, 39 Cal.3d 197, to guide our review of the trial court's actions.

In *Payne, supra*, 17 Cal.3d 908, as here, an incarcerated person, Payne, was sued for damages based on the crime for which he had been convicted. (*Id.* at pp. 911–912.) He was unrepresented, and the Department of Corrections denied his request to allow him to attend the trial. (*Id.* at p. 912.) In his absence, the trial court entered a default judgment against him. (*Ibid.*) He filed a petition for writ of error on the ground that he had been denied permission to attend trial and had been denied his right to counsel. (*Ibid.*) Treating the petition as a motion to vacate, the trial court denied it. (*Ibid.*) The Supreme Court concluded that, if Payne were indigent, the trial court's rulings had violated his right to court access. (*Id.* at pp. 926–927.)

After establishing that an indigent, incarcerated civil defendant facing bona fide legal action threatening his interests has a right to court access, the *Payne* court discussed potential remedies to ensure that access. (*Payne, supra*, 17 Cal.3d at pp. 923–925.)

"One possible solution," it noted, "is to accord prisoners the right of personal appearance to defend any action, but to deny indigent prisoners appointed counsel." (*Payne, supra*, 17 Cal.3d at p. 923.) The Court observed that such an approach had the advantage of "superficial symmetry" between indigent prisoners and indigent free people. (*Ibid.*) But "prisoners do not have the same access to free legal services as other indigents. Equally

18

significant, a prisoner, unlike a free person, is not able to seek out witnesses in his behalf or undertake the investigative functions often needed to defend a civil suit." (*Ibid.*)  It concluded that, at least as a blanket rule, "allowing a right of personal appearance is not an appropriate remedy for prisoners seeking to defend a civil action." (*Ibid.*)

The Court also considered a rule that trial courts defer trial until after the release of an indigent, incarcerated defendant. (*Payne, supra*, 17 Cal.3d at p. 923.)  In some circumstances, the Court concluded, when a postponement would not substantially prejudice the rights of plaintiffs, this remedy would suffice. (*Ibid.*)  "However," the Court continued, "in many situations, particularly when a defendant is serving a long term of confinement, a postponement will substantially impair the interests of the plaintiff." (*Ibid.*)

"In those cases," the Court concluded, "the only feasible method of granting access rights to indigent prisoners is appointment of counsel." (*Payne, supra*, 17 Cal.3d at p. 923.)  The Court noted that it was not establishing an absolute right to appointment of counsel. (*Id.* at p. 924.)  But in cases where the threshold requirements are met, and a continuance is not feasible, the trial court should ascertain "whether an attorney would be helpful . . . under the circumstances of the case." (*Ibid.*)  It noted that the determination should be simple. (*Ibid.*)  "[I]f the prisoner is not contesting the suit against him, or any aspect of it, there is no need for counsel; but if he plans to defend the action and an adverse judgment would affect his present or future property rights, an attorney should be appointed." (*Ibid.*)

In *Yarbrough, supra*, 39 Cal.3d 197, the Supreme Court confirmed the right to court access and the inquiry process set forth in *Payne*. (*Yarbrough*, at p. 207.)  A trial court, it reiterated, is required "to consider the defendant's

19

indigency, the feasibility of a continuance, whether [the] defendant's interests are actually at stake, and whether counsel would be helpful under the circumstances." (*Ibid*.) It also elaborated on when counsel would be helpful. (*Id*. at p. 205.) In a case in which the incarcerated person is collaterally estopped to relitigate issues decided against them in their prior criminal trial, for example, the trial court should consider whether other questions of fact remain to be litigated. (*Ibid*.) A determination that counsel would not be helpful on the question of liability in such circumstances, it noted, "does not . . . foreclose the need for counsel on the issue of the amount of damages." (*Id*. at p. 206.)

McCauley was not asking that counsel be appointed for him. Rather, having just learned that the family court had finally signed an order granting him access to some of his funds to hire a lawyer to represent him, he was seeking a continuance that would have allowed him to do so. There is no doubt, under the guidelines of *Payne* and *Yarbrough,* that this was a case in which an attorney would have been helpful. (See *Payne, supra*, 17 Cal.3d at p. 923; *Yarbrough, supra*, 39 Cal.3d at p. 207.) McCauley faced a bona fide civil suit seeking millions of dollars in damages. (See *Payne,* at p. 924; *Yarbrough,* at p. 207.) He planned to contest the action. (See *Payne,* at p. 924.) Although his conviction collaterally estopped him to relitigate some issues in the civil case, other issues would be litigated. (See *Yarbrough*, at pp. 205–206.) Counsel might not have advised contesting every one of them, but the jury had to decide whether McCauley's acts were a substantial factor in causing Mary D. harm; whether his conduct was outrageous; whether he intended to cause Mary D. emotional distress; whether she suffered emotional distress; what were the amounts of her past noneconomic damages, future noneconomic damages, and future economic damages; whether

McCauley acted with malice or oppression; and what amount of punitive damages, if any, was appropriate.

Moreover, both *Payne* and *Yarbrough* approved postponement as a tool for ensuring access so long as the delay did not substantially prejudice the plaintiff's rights. (*Payne, supra*, 17 Cal.3d at p. 923; *Yarbrough, supra*, 39 Cal.3d at p. 206.) As acknowledged in *Payne*, it would not be fair or practical to defer a trial until after a defendant completed a lengthy prison sentence. (*Payne*, at p. 923.) But here, an appropriate continuance would not have been a matter of years or even months. Mary D. does not argue that any delay to enable McCauley to retain counsel would have caused her substantial prejudice.

Citing *Wantuch v. Davis, supra*, 32 Cal.App.4th 786, Mary D. argues that an indigent, incarcerated litigant "does not have the right to any particular remedy," and that "the trial court determines the appropriate remedy to secure access in the exercise of its sound discretion." (*Id.* at p. 794.) She notes that *Wantuch* lists possible remedies, drawn from case law, which include "use of closed circuit television or other modern electronic media" and "transfer of the prisoner to court." (See *id.* at pp. 792–793.) In her view, it was enough for the trial court to ensure court access by arranging for McCauley to appear by videoconference.

We are not persuaded. The fact that different remedies have been described in the case law does not mean that any one of them may be deemed adequate for any situation. A trial court must exercise its discretion within the guidelines outlined in *Payne, supra*, 17 Cal.3d 908, and *Yarbrough, supra*, 39 Cal.3d 197. (*Yarbrough*, at p. 207.) As *Payne* explains, the question of remedy in a case like this one is straightforward. (*Payne,* at p. 924.) If the defendant plans to contest the action and an adverse judgment

21

would affect his interests, then representation by an attorney is warranted. (*Ibid.*)  We recognize that there are circumstances in which an incarcerated litigant's appearance, via electronic media or otherwise, may provide meaningful access.  But such circumstances do not include trial in a case with (1) a defendant who has asked for help securing counsel and has, or soon will have, the ability to pay for counsel, (2) disputed facts on at least some important issues, and (3) significant financial exposure.

In addition, we do not agree that evidence of McCauley's videoconference participation in pretrial and trial shows that he had meaningful access—thus suggesting that the trial court had acted reasonably.  First, we review the trial court's exercise of discretion as of the time it was exercised, not in light of subsequent events.  (See *People v. Welch* (1999) 20 Cal.4th 701, 739.)  Second, and regardless, we find Mary D.'s characterization of McCauley's participation to be overstated.  When McCauley was represented at the outset of this action, the parties' attorneys estimated that trial would take 10 days.  It ended up taking less than four. McCauley entered no exhibits into evidence and he called no witnesses.  His opening statement lasted one minute, in contrast to Mary D.'s, which lasted 15.  The only objection he made was overruled.  He made no closing argument.  He made no objections to jury instructions or the verdict form. His lack of legal training left him little more than a spectator to the proceedings against him.

Under these circumstances—where McCauley needed a relatively brief continuance to use the funds the family court had finally released for him to retain counsel—we do not agree that the trial court adequately protected his constitutional right of meaningful access by allowing him to participate by videoconference.

**E.**

Mary D. argues that any error was harmless. The parties agree that the standard in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) applies when the denial of a continuance that results in a deprivation of counsel violates a constitutionally protected right. (See *In re Marriage of Tara & Robert D.* (2024) 99 Cal.App.5th 871, 888, fn. 7.)[8]

To be sure, this is not a case in which McCauley's liability was in doubt. His criminal convictions, which were final, prevented him from relitigating the facts of what he had done to Mary D. throughout her childhood. Even with a lawyer, McCauley would almost certainly be found liable to her for substantial damages. But McCauley contends that the numbers suggested by Mary D.'s counsel and adopted by the jury were not based on specific testimony or evidence, and a lawyer could have provided assistance in reducing them. McCauley himself presented no alternative argument or evidence. Mary D. argues that it is equally plausible that the jury would have arrived at the same damages figures—those proposed by her counsel and unrebutted by McCauley—even if McCauley had been represented. But "equally plausible" is not the standard that the parties agree applies. (See *Chapman, supra*, 386 U.S. at p. 24.)

Mary D. also contends that McCauley has failed to show prejudice because he "makes no representation" regarding the availability of a lawyer had the trial court granted his continuance request. But under the *Chapman*

---

[8] This case, cited by Mary D., did not hold that *Chapman* necessarily applies; rather, it clarified that it applied the standard in *People v. Watson* (1956) 46 Cal.2d 818, 836, because there was no claim that the denial of the continuance, although it resulted in a deprivation of trial counsel, gave rise to a constitutional violation. (*In re Marriage of Tara & Robert D., supra*, 99 Cal.App.5th at p. 888, fn. 7.) Without deciding the issue, we accept the parties' reliance on the *Chapman* standard for purposes of this decision.

standard, it is the party benefiting from a constitutional error who bears the burden of showing the error was harmless. (*Chapman, supra*, 386 U.S. at p. 24.) McCauley had just learned that he had access to the funds when the trial court declined any continuance. Mary D. offers no reason to conclude that McCauley could *not* have found a lawyer once he was able to pay for one.

Accordingly, we cannot "declare a belief that [the court's error] was harmless beyond a reasonable doubt." (*Chapman, supra*, 386 U.S. at p. 24.)

**F.**

McCauley contends that reversal based on the trial court's denial of a continuance should result in a remand for a new trial only on liability and compensatory damages—not on punitive damages. He argues that the punitive damages award is not supported by substantial evidence, and therefore the award should be vacated and not retried. McCauley cites no authority, however, for the proposition that he may challenge the fairness of the proceeding as a whole but exempt from retrial an issue on which he claims Mary D. failed to carry her burden of proof, and we are not bound to develop the argument for him. (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830.) Accordingly, we do not reach McCauley's substantial evidence challenge to the punitive damages award. We remand the issue of punitive damages for retrial along with the issues of liability and tort damages.

**II.**

McCauley contends that the trial court abused its discretion by admitting eight school photographs of Mary D., one for each year from prekindergarten through third grade and sixth grade through eighth grade. Because this issue is likely to recur in a new trial, we explain why we are

24

unpersuaded by McCauley's argument that the court abused its discretion.[9] We first recount additional facts for context, and then we address the argument.

McCauley was Mary D.'s uncle and godfather. When Mary D. was in prekindergarten, McCauley started picking her up from school three or four days a week. Mary D. first remembers him abusing her when she was in kindergarten or first grade. The abuse did not stop until she was in high school. At trial, Mary D. was 29 years old.

Though relevant evidence is generally admissible (Evid. Code, § 351), a trial court may exclude it if its probative value is substantially outweighed by the probability that it will create substantial danger of undue prejudice (*id.* at § 352). "Relevant evidence" means evidence having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action. (*Id.* at § 210.) "Evidence is substantially more prejudicial than probative . . . [only] if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome.' " (*People v. Waidla* (2000) 22 Cal.4th 690, 724.) We review the trial court's decision to admit evidence for abuse of discretion. (*Id.* at p. 717.)

The photographs should have been excluded, McCauley argues, because there was no dispute as to Mary D.'s age at the time of the abuse.[10] While he

---

[9] Because we conclude that the court did not err, and because we include this discussion for the benefit of the parties and the court in a retrial, we do not reach Mary D.'s argument that McCauley forfeited his argument by failing to object. Nor do we reach McCauley's contention that he was prejudiced by the purported error.

[10] The evidence appears to support that the abuse started when Mary D. was in kindergarten or first grade, not when she was in prekindergarten. McCauley does not raise this point, however, either by alleging specific error as to the photograph from prekindergarten or otherwise. Nor does he challenge the statement in Mary D.'s brief on appeal

25

is correct as to the lack of dispute, his argument misses the probative value, and thus the relevance, of the photographs. (See *People v. Cage* (2015) 62 Cal.4th 256, 283 [prosecutor may use photographic evidence even when defendant stipulates to a fact].) Information about a child's age by number of years is more abstract than a photograph that offers concrete visual details that can help a juror understand the child's developmental stage at that time. Here, these visual details were particularly useful given that the plaintiff sitting before the jurors in the courtroom was then a young adult. Further, we agree with Mary D. that her ages, and the related developmental stages, during the time that McCauley abused her were relevant to whether McCauley acted with malice, to whether his conduct was outrageous, and to the physical pain, mental suffering, loss of enjoyment of life, grief, anxiety, humiliation, embarrassment, worry, and emotional distress that she suffered in the years of abuse. McCauley argues that these elements were addressed by testimony. But "evidence does not become irrelevant simply because other evidence may establish the same point." (*People v. Smithey* (1999) 20 Cal.4th 936, 973–974.)

We are unpersuaded that the photographs presented a danger of undue prejudice that would warrant their exclusion under Evidence Code section 352. They were limited to one for each year. And, as Mary D. notes, they were not selected for an emotional response. (See *People v. Suff* (2014) 58 Cal.4th 1013, 1070–1073.) They do not, for example, show her playing with toys or a pet or hugging a family member or a friend. (See *ibid.*) We

that the photographs "show [her] at each age she was abused by McCauley . . . ." Accordingly, we do not address the prekindergarten photograph separately from the others.

conclude that the photographs' potential for prejudice did not substantially outweigh their probative worth.

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court for a new trial. The court is instructed to ensure McCauley's meaningful access to the court consistent with this opinion if McCauley meets the threshold requirements of *Payne, supra,* 17 Cal.3d 908, at the time of the remand. McCauley is entitled to recover costs on appeal.

GOLDMAN, J.

WE CONCUR:

STREETER, Acting P. J.
SWEET, J. *

---

*Judge of the Marin Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

27

| Trial Court: | Alameda County Superior Court |
|---|---|
| Trial Judge: | Honorable Somnath Raj Chatterjee |
| Counsel for Plaintiff and Respondent: | Mazur & Mazur, Janice Ryan Mazur |
| Counsel for Defendant and Appellant: | Law Offices of Tiffany J. Gates and Tiffany J. Gates<br>Law Offices of Scott A. Bonzell and Scott A. Bonzell |